UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WILLIAM MANERY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:22-cv-00239-SEB-MG |
| | ) | |
| JASON LEE, | ) | |
| MARION COUNTY SHERIFF'S OFFICE, | ) | |
| CONSOLIDATED CITY OF INDIANAPO- | ) | |
| LIS AND MARION COUNTY, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Plaintiff William Manery ("Mr. Manery") filed this lawsuit against Defendants

Lieutenant Jason Lee ("Lt. Lee") in his official capacity, the Marion County Sheriff's Office

("MCSO"), and the Consolidated City of Indianapolis and Marion County ("Consolidated

City") (collectively, "Defendants"), pursuant to 42 U.S.C. § 1983 and Indiana statutes,

based on his claims regarding the use of deadly force against him during his arrest on an

out-of-state warrant. Defendants have moved for summary judgment. Dkt. 46. For the rea-

sons explained below, Defendants' motion is **DENIED IN PART** and **GRANTED IN**

**PART**.

## LEGAL STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary

because there is no genuine dispute as to any material fact and, instead, the movant is en-

titled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard

provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247−48 (1986) (emphasis in original). Material facts are those that "might affect the outcome of the suit," and a dispute about a material fact is genuine when "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

When deciding whether a genuine dispute of material fact exists, the court construes all facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572 (7th Cir. 2021).

**BACKGROUND**

## I.  FACTUAL BACKGROUND

### A.  Out of State Warrant

At approximately 3:36 p.m. on April 10, 2021, Lt. Lee, a reserve sheriff who regularly volunteered at the MCSO, was monitoring radio traffic through the computer aided dispatch ("CAD") when he overheard a request to execute an out-of-state arrest warrant from Rutherford County, Tennessee. The Rutherford County Sheriff's Office ("RCSO") had been actively tracking the suspect's cellular location information and had located him in a parking lot in downtown Broad Ripple, a neighborhood located in Indianapolis north of the downtown area. The RCSO's request included a description of the suspect's vehicle as being a white Jeep Cherokee with front-end damage and a Tennessee license plate. According to the CAD, the suspect was wanted for aggravated assault with a vehicle, evasion

of arrest, and violation of probation. CAD 2, dkt. 48-3. The CAD also warned that the suspect was possibly armed, potentially a flight risk, and on prior occasions had threatened "suicide by cop."[1] *Id.*

Because no photo of the wanted suspect accompanied the RCSO's request, MCSO Sergeant James Russo ("Sgt. Russo") radioed the control operator to request assistance in finding a photo of the suspect because Indiana officers cannot access out-of-state photo identifications. Lt. Lee, while still listening to the radio, searched the suspect's name on Facebook and located Mr. Manery's profile, which matched the description provided in the warrant. After Lt. Lee informed Sgt. Russo that he had found a photo of Mr. Manery, Lt. Lee was enlisted to assist in executing the warrant.

Lt. Lee met a team of deputies (the "warrant team"), which included Sgt. Russo and MCSO Deputy Sean White ("Deputy White"),[2] at the parking lot of an empty, out-of-business Kroger store in Broad Ripple. While congregated there, the warrant team formulated a plan based on their belief that Mr. Manery was located inside a nearby Broad Ripple apartment complex visiting a family member who resided there. The warrant team traveled to Mr. Manery's location where they spotted the white Jeep Cherokee in a parking lot adjacent to the apartment complex.

---

[1] We are informed that "suicide by cop" refers to an arrestee's placement of himself in a police encounter wherein law enforcement is required to resort to using deadly force.

[2] In total, the warrant team included Sgt. Russo, Lt. Lee, Deputy Sean White, Deputy Scott Craig, K-9 Cpl. Erik Stojkovich, K-9 Rhino, and Deputy Brandon Wilcox. Dkt. 48-2 at 146.

### B.    Warrant Execution

We derive the following facts from two clips of video footage provided by tenants of the adjacent apartment complex as well as from Lt. Lee's own testimony. Though Mr. Manery survived the encounter, his memory has been impaired by his use of methamphetamines at or around the time of this incident.

A caravan of deputies proceeded to the apartment complex parking lot, and, with Deputy White leading the way in his marked Dodge Charger, he observed the suspect's Jeep parked in a south-facing parking space. A blue sedan was parked on the left side of the Jeep. Deputy White pulled his vehicle behind the Jeep's driver's side, and Lt. Lee parked his marked Crown Vic on the Jeep's passenger side, parallel to Deputy White's Charger. Deputy Wilcox backed his squad car, an unmarked black sedan, into an empty parking space located approximately three spaces to the right of the Jeep.

Deputy White exited his vehicle and approached the driver's side of the Jeep where he discovered that the Jeep was occupied by man asleep in the driver's seat. Lt. Lee simultaneously approached the Jeep along the passenger side and identified the "disheveled" occupant as Mr. Manery. *See* Lee Dep. 49:3–4, dkt. 48-2.



Lambert Aff. ¶ 4, dkt. 48-5 (authenticating video evidence); *id.* Ex. 1 (video collected by Darren Hickman) (hereinafter "Hickman Video").

As shown in still shots captured from the video footage, Deputy White stood at the driver's side window and pointed his firearm and flashlight inside, awakening Mr. Manery with repeated commands: "Show me your hands!" and "Do not move!" Lee Dep. 35:19–21, dkt. 48-2; Manery Dep. 33:1–2, dkt. 48-1.[3] Lt. Lee stood outside the passenger side window, twice striking the window with the nose of his pistol to break the glass and deploy his taser. Meanwhile, Mr. Manery proceeded to shift his hands in and out of his pockets and eventually started the ignition, despite Deputy White's commands, "Don't do that! Do

---

[3] In the Internal Affairs Report, Deputy White stated that he did not retrieve his firearm until after Mr. Manery disobeyed commands to keep his hands where deputies could see them. Internal Affs. Rep. 4, dkt. 57-4. While we do not make credibility determinations at the summary judgment stage, Deputy White's rendition of the facts is flatly contradicted by video footage, which shows that Deputy White had drawn his weapon as he initially approached the Jeep and had pointed it at Mr. Manery when he started shouting commands. *See generally* Hickman Video, dkt. 48-5.

not start this car!" Internal Affs. Rep. 5, dkt. 57-8. This interaction continued for approximately twenty seconds, during which time three more uniformed officers from the warrant team gathered around the Jeep.

Mr. Manery put the Jeep in reverse, striking Deputy White's parked vehicle as he arced westward toward Westfield Boulevard, where at least two vehicles were idling their engines at a four-way stop sign. Four deputies rushed to their vehicles in anticipation of a possible vehicle chase, while Lt. Lee pursued the Jeep on foot. The Jeep struck a curb at the edge of the parking lot, which halted the Jeep's movement. As Lt. Lee pursued the Jeep on foot, he recalled that Mr. Manery had "revved his motor to the loudest fucking engine noise [he had] ever heard in [his] life." Lee Dep. 39:3–4, dkt. 48-2.



Hickman Video, dkt. 48-5. Still attempting to escape, Mr. Manery turned the Jeep's front wheels to the left and accelerated forward, promptly colliding into Deputy Wilcox's unmarked vehicle at a perpendicular angle.



*Id.* After Mr. Manery's car struck Deputy Wilcox's car, Lt. Lee opened fire. As depicted above, Lt. Lee is no longer visible in the video frame at the time he shoots his firearm at Mr. Manery. Though initially thinking he had only fired twice, it was determined that Lt. Lee discharged a total of nine bullets, all of which entered the Jeep through the driver's side door. Lee Dep. 43:21–25, dkt. 48-2. The first four to five shots were fired in quick succession, followed by a brief pause and then a volley of the remaining bullets. Four of these bullets struck Mr. Manery.

This encounter between the warrant team and Mr. Manery unfolded in less than sixty seconds.

After the shots were fired, Mr. Manery was removed from the Jeep and administered first aid until an ambulance arrived and transported him to the hospital in critical, but stable, condition. Mr. Manery was hit by bullets in his left arm, left hip, chest, and stomach.

Manery Dep. 23:19–20, dkt. 57-1. The parties dispute the nature and extent of Mr. Manery's injuries, but those issues are ultimately not germane to today's ruling.

Based on this failed effort to evade arrest, Mr. Manery has since pled guilty to one count of resisting law enforcement as a Level 6 Felony under Indiana law.

### C.    MCSO Use of Force Policies and Training

The MCSO has two policy sources addressing a proper use of force: General Order 21: Use of Force ("General Order 21") and the MCSO's Rules and Regulations ("Rules and Regulations").[4] Roberts Dep. 9:19–10:1, dkt. 48-6. These documents comprise the entirety of the MCSO's policies pertaining to the use of force, including excessive and deadly force. *Id.* 14:22–15:4. Relatedly, these policies apply equally to fulltime and reserve deputies. *Id.* 17:16–18.

Before commencing their service with the MCSO, all deputies, including both fulltime and reserve, are required to complete approximately 600 hours with the MCSO training academy, which academy is accredited by the Commission on Accreditation for Law Enforcement Agencies ("CALEA"). Over the course of ten months, each candidate undergoes training on MCSO policies and procedures, including but not limited to the use of force.

---

[4] Defendants initially proffered five MCSO policies, three of which Mr. Manery contended were irrelevant to these facts. Specifically, Policy JP-2-32 applies only to the Jail Division; General Order 18.1 relates to remedial training and is optional at the supervisor's discretion; and General Order 18.3(a) outlines the policies and procedures for the Firearms Review Board, which becomes involved only after there has been a police-involved shooting. *See generally* Roberts Aff., dkt. 48-7. In their reply brief, Defendants apparently concede that the "MCSO may only have two policies governing the use of force," so we limit our discussion to the two undisputed policies. Defs.' Reply 11, dkt. 63.

CALEA performs annual reviews of the curriculum followed at the MCSO training academy to ensure compliance with CALEA standards. The State of Indiana also imposes certain statutory training requirements as well, for example, by requiring all reserve deputies to complete twenty-four hours of continuing education training each year.

Under MCSO department policy, reserve deputies must work a monthly minimum of thirty-two hours to retain their reserve status. *Id.* 31:7–15. There are, however, no department-imposed consequences for failure to meet the monthly work minimum. Lee Dep. 22:3–6, dkt. 57-3. From 2020 to 2021, the MCSO had opted not to enforce a monthly minimum at all. *Id.*

### D.    Lt. Lee's Training

In 2013, Lt. Lee completed his reserve academy training with the Morgan County Sheriff's Department. In 2016, before joining the MCSO, Lt. Lee completed 133 hours at the Indiana Law Enforcement Academy, receiving instruction on firearms and the use of force, among other subjects. According to MCSO records, Lt. Lee had received all the available and pertinent trainings on firearms, warrants, and use of force as of the time of his encounter with Mr. Manery.

### E.    MCSO Internal Investigation

The MCSO Internal Affairs investigated this incident with Mr. Manery as an officer-involved shooting. In addition to Lt. Lee, Internal Affairs interviewed the members of the warrant team and took recorded statements from Sgt. Russo, Deputy White, Deputy Wilcox, Cpl. Stojkovich, and Deputy Scott. Internal Affairs ultimately concluded that "Lt. Lee may be in violation of the following Marion County Sheriff's Office Rules and

Regulations" under Chapter IV: Firearms Policy, which defines the policy's purpose as "provid[ing] a reference to all the Departmental polices [sic] concerning the use, type, care, and handling of firearms . . . ." Internal Affs. Rep. 8, dkt. 57-4. Internal Affairs also found that Lt. Lee "may not be in violation" of General Order 21 and its prohibition against "[f]iring, at, or from, a moving vehicle unless the deputy's life, or another person's life, is in imminent danger of serious bodily injury or death and other options do not exist." *Id.*

Following an additional investigation by the Indianapolis Metropolitan Police Department ("IMPD"), Special Prosecutor Brian Eaton determined that no criminal charges would be filed against Lt. Lee.

## II.   PROCEDURAL HISTORY

Mr. Manery brought this civil action against Lt. Lee, the MCSO, and the Consolidated City in state court on January 17, 2022. Defendants timely removed it to federal court on February 1, 2022.

Mr. Manery's complaint asserts a Section 1983 claim against Lt. Lee for using unjustified deadly force in violation of the Fourth Amendment to the United States Constitution. He also brought a *Monell* claim against the MCSO and the Consolidated City for their alleged failures to train law enforcement officers. Lastly, Mr. Manery brought various state law claims against all Defendants for their purportedly negligent, criminal, malicious, and/or wanton actions.

Mr. Manery initially named Lt. Lee in both his individual and official capacities, but because the MCSO has since stated that Lt. Lee was acting in the scope and course of his employment during the incident at issue, Mr. Manery has dropped his claims against

10

Lt. Lee in his individual capacity. Pl.'s Resp. 13, dkt. 58. Similarly, Mr. Manery has conceded that his claims against the Consolidated City cannot proceed. *Id.* at 2.

On May 1, 2023, Defendants moved for summary judgment on all the remaining federal and state claims brought by Mr. Manery. That motion is now fully briefed and ripe for ruling.

## DISCUSSION

## I.  SECTION 1983 CLAIM AGAINST LT. LEE FOR VIOLATION OF THE FOURTH AMENDMENT

We begin by determining whether the facts, taken in the light most favorable to Mr. Manery, "depict a violation of a constitutional right." *Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015). Mr. Manery alleges that Lt. Lee used excessive force in violation of the Fourth Amendment when he shot him. "A police officer's use of deadly force is a seizure within the meaning of the Fourth Amendment and accordingly must be reasonable." *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002). Without a doubt, a non-fatal shooting, such as the one here, qualifies as an application of deadly force. *Smith v. Finkley*, 10 F.4th 725, 729, 738–42 (7th Cir. 2021). An officer acts reasonably when deploying force, if he has probable cause to believe that the suspect poses a threat of serious physical harm either to the officer or to others. *Id.* at 736.

In evaluating the objective reasonableness—and, thus, the constitutionality—of an officer's use of force, courts consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386,

396 (1989). However, "a person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent danger[,] or he is actively resisting arrest and the circumstances warrant that degree of force." *Weinmann*, 787 F.3d at 448; *e.g.*, *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020). The fundamental concern in evaluating reasonableness is whether the totality of the circumstances justified a particular use of force to effect a seizure. *Smith*, 10 F.4th at 736.

"[W]hen an individual threatens a police officer with a deadly weapon, the officer is permitted to use deadly force in self-defense" because, at that point, "the risk of serious physical harm to the officer or others has been established." *Scott v. Edinburg*, 346 F.3d 752, 756 n.2, 757 (7th Cir. 2003). An automobile may be used as a deadly weapon; thus, officers may justifiably use deadly force when a suspect drives toward them with an automobile. *Id.* at 757. However, the occasion to use deadly force is temporally limited: Even "[w]hen an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity." *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993); *see*, *e.g.*, *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999) ("A passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect.").

At bottom, the reasonableness inquiry is an objective one, meaning that courts must "assess the totality of the circumstances 'from the perspective of a reasonable officer on the scene' " without regard to facts later revealed through the "benefit of hindsight, discovery, and careful analysis." *Siler*, 957 F.3d at 759 (quoting *Graham*, 490 U.S. at 396). In so doing, we consider "the information known to the officer at the time of the encounter; the

duration of the encounter; the level of duress involved; and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances." *Id.* (quoting *Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018)). In short, "[t]he law does not divorce the objective constitutional standard from . . . reality." *Logan v. City of South Bend*, 564 F.Supp.3d 719, 728 (N.D. Ind. 2021).

Summary judgment "is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, (7th Cir. 2010); *e.g.*, *Siler*, 957 F.3d at 759. When presented with a genuine dispute of material fact at summary judgment, courts are tasked to view those facts in the light most favorable to the nonmovant. *Smith*, 10 F.4th at 730. Courts need not "indulge stories clearly contradicted by the footage" because, in those instances, there can be no genuine factual dispute. *Id.* (quoting *Horton*, 883 F.3d at 944). However, "videos are sometimes unclear, incomplete, and fairly open to varying interpretations." *Id.* (quoting *Horton*, 833 F.3d at 944). Where some videos may conclusively establish what happened, others may leave factual questions unanswered. *Id.* Those "ambiguous" videos "can be relied on only for those facts that can be established 'with confidence' and 'beyond reasonable question.' " *Id.* (quoting *Johnson v. Rogers*, 944 F.3d 966, 967, 969 (7th Cir. 2019)).

Applying these legal principles, the key inquiry before us is whether a reasonable jury could find that Lt. Lee lacked probable cause to believe that Mr. Manery posed an immediate threat to the safety of himself and of others. In making this determination, due regard is owed to the uncertainties that Lt. Lee and the other deputies confronted that day.

Lt. Lee knew that Mr. Manery was wanted on a warrant for aggravated assault with a vehicle, evading arrest, and violating probation. Lt. Lee also reasonably believed that Mr. Manery was armed with a handgun and had (on unspecified prior occasions) threatened suicide by cop.[5] It is also undisputed that Mr. Manery demonstrated active resistance to the MCSO deputies by disregarding their repeated commands and attempting to flee.

Though nearly two hours elapsed between the dispatcher's transmission of the Rutherford County's warrant request and the warrant team's execution of that warrant, the actual encounter with Mr. Manery occurred in less than a minute. During that brief span of time, the scene evolved into an unpredictable, highly stressful situation, requiring Lt. Lee to make split-second judgments.

However, "the totality of the circumstances to justify a seizure includes the period just before and during the shooting." *Smith*, 10 F.4th at 739. As a matter of Fourth Amendment jurisprudence, an officer may justifiably use deadly force when a fleeing felon drives at him with a vehicle. *Est. of Starks v. Enyart*, 5 F.3d 230, 233–34 (7th Cir. 1993).

Therein lies the factual dispute in the record before us. Lt. Lee contends that, when he made the decision to open fire, Mr. Manery was driving straight toward him, therefore justifying the use of deadly force. Defendants also claim that "Plaintiff cannot dispute many of these facts because . . . he has virtually no memory of his encounter with the MCSO's

---

[5] Although Mr. Manery ultimately turned out to be unarmed, he does not dispute that Lt. Lee permissibly relied on the information conveyed by the dispatcher. "Knowledge of facts and circumstances gained after the fact has no place in the post-hoc analysis of the reasonableness of the actor's judgment." *Siler*, 957 F.3d at 760 n.10 (quoting *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988)) (cleaned up). Thus, that the dispatcher conveyed inaccurate information has no bearing on the reasonableness of Lt. Lee's reliance.

warrant team." Defs.' Reply 2, dkt. 63. This assertion is "simply false." *Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021). "Taking the facts in the light most favorable to the non-moving party does not mean that the facts must come only from the nonmoving party. Sometimes the facts taken in the light most favorable to the nonmoving party come from . . . other sources." *Id.* Such is the case here, where Mr. Manery has identified factual disputes contained within the video footage, arguing that Lt. Lee was "safely out of the way" before shooting and that he was blocked from driving forward by the other on-scene police vehicles. Our review of the evidence before us leads us to conclude that Mr. Manery has satisfied his burden at this summary judgment stage in establishing the existence of genuine disputes of material fact.

According to Lt. Lee's description of these events, after the Jeep struck the curb, he heard a loud engine noise followed by the Jeep's forward movement. Lt Lee says that he fired his weapon as Mr. Manery drove the Jeep toward him. Lee Aff. ¶ 23; *see also* Lee. Dep. 39:7, dkt. 48-2 (testifying that he "was in front of the Jeep" as it "started proceeding in [his] direction"). Lt. Lee's testimony describes the Jeep's trajectory before it hit the parked car, but he did not testify that the Jeep was still heading straight toward him after the collision that stopped the Jeep's forward movement. In fact, nowhere in Lt. Lee's deposition testimony or affidavit does he personally mention the Jeep's collision with the parked car or its effect on his calculus. *Cf.* Lee. Dep. 44:12–15, dkt. 48-2 ("Like, how your client's vehicle is ran [sic] into that, to that police car? I don't remember that."). When questioned about whether the parked vehicle blocked Mr. Manery's ability to drive forward, Lt. Lee's responses offered little clarity:

Q: Does it look, from these images, that that car is blocking Mr. Manery's ability to drive forward?

A: No.

Q: How come?

A: Well, that car was parked in the parking—in a parking stall. Mr. Manery struck that vehicle.

Q: But it wasn't blocking him?

A: I mean, yeah, there's several vehicles parked there. If he hits all those vehicles, those vehicles are blocking him.

*Id.* at 40:10–20.

The video footage makes clear that Lt. Lee fired his first shot after Mr. Manery had collided with the parked car and was no longer moving forward. On this basis alone, a reasonable juror could discount Lt. Lee's version of the facts and conclude instead that Mr. Manery's escape had effectively been prevented by the preceding collision. If a jury were so to conclude, it would undermine Lt. Lee's argument that Mr. Manery posed an immediate threat that justified deadly force.

Moreover, Lt. Lee's statement that he had been standing in front of the Jeep when he decided to fire does not comport with subsequent testimony by him that he had moved forty-five degrees off to the side. *Id.* at 40:23–41:1. During certain critical moments, Lt. Lee disappears from the videoframe, which combined with his testimony leaves unanswered the issue of his proximity to the Jeep at the moment he fired. *See id.* at 48:4–5 ("Q: Where do you think you were standing? A: How far does brass travel?").

16

In the summary judgment briefing, Lt. Lee argues that the Jeep's front wheels were turned toward him, thus placing him "directly in the Jeep's path when he decided to shoot." Defs.' Reply 8, dkt. 63. Though it appears true that Mr. Manery had turned the Jeep's wheels in his (ultimately misguided) effort to drive away, that was not the precise moment when Lt. Lee discharged his weapon. From the video footage, it seems clear that Lt. Lee did not shoot Mr. Manery until *after* the Jeep had hit the parked car. Lt. Lee's description of the Jeep's wheels, therefore, simply does not take into account the obvious obstruction of the parked car.

Lt. Lee's subjective belief that Mr. Manery was driving straight at him does not convert his belief into an objective one. We cannot conclude, as Lt. Lee asks us to, that an objective officer standing in his shoes would believe that Mr. Manery was destined to run him over with the Jeep—especially not after the Jeep was immobilized (even if only momentarily) by its collision with the other parked car. Arguably, at the moment of the collision, the threat Mr. Manery posed could have sufficiently diminished such that the totality of the circumstances no longer warranted the use of any force, never mind deadly force. *Smith*, 10 F.4th at 748. Once the threat had subsided, a reasonable officer may not fairly view those circumstances to warrant deadly force. *Id.*; *accord Lytle v. Bexar Cnty.*, 560 F.3d 404, 413 (5th Cir. 2009) ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased.").

Lt. Lee also argues that his decision to use deadly force was justified to protect other deputies and those in the immediate vicinity. This argument, too, is premised on Lt. Lee's belief that Mr. Manery was driving "straight towards" him. Whether Mr. Manery was

actually still headed toward Lt. Lee after the collision with the parked car is a question the jury must resolve at trial.

At the summary judgment stage, we need only determine whether a reasonable juror could view the evidence as Plaintiff does, and here, the answer is yes. *Rios v. City of Chicago*, 523 F.Supp.3d 1020, 1026 (N.D. Ind. 2021). In weighing all the evidence—including the video footage, witness testimony, and circumstantial evidence—we hold that a reasonable juror could find that Mr. Manery was not driving directly toward Lt. Lee, nor could he after colliding with the parked car, so as to warrant a use of deadly force by the officer to protect himself or others in the area.

It is undisputed that at least two vehicles sat at the four-way stop sign adjacent to the parking lot. But whether Mr. Manery posed an immediate threat to them once he struck the curb and changed course is not at all clear. A factual dispute remains as to whether Mr. Manery posed an immediate threat once he was no longer moving forward at all. *Cf. Tousis v. Billiot*, 84 F.4th 692 (7th Cir. 2023) (officer fired weapon "as soon as" vehicle pulled forward). In addition, the collision that halted Mr. Manery's forward motion raises questions about whether Mr. Manery posed an immediate risk to the public's safety and, consequently, whether deadly force was reasonable on that basis. Because we cannot resolve these factual questions on summary judgment, the motion must be denied.

## II.    QUALIFIED IMMUNITY

Notwithstanding the reasonableness inquiry, Lt. Lee maintains that he is entitled to qualified immunity. When governmental actors perform discretionary functions, qualified immunity shields them from liability for civil damages "insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity grants "no license to lawless conduct"; rather, it focuses on "the objective reasonableness of an official's conduct, as measured by reference to clearly established law." *Id.* at 818–19. In effect, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

To determine whether qualified immunity protects an officer's use of deadly force, trial courts are directed to address two issues: (1) whether, taking the facts in the light most favorable to the plaintiff, the officer's conduct violated a constitutional right; and (2) whether the particular constitutional right was "clearly established" at the time of the alleged violation. *In re Escobedo v. Bender*, 600 F.3d 770, 778 (7th Cir. 2010) (citations omitted).

Qualified immunity "leaves ample room for mistaken judgments by police officers." *Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003) (internal quotation omitted). Police, therefore, receive immunity from suits that arise out of their reasonable mistakes of fact or law. Accordingly, qualified immunity could protect Lt. Lee's conduct from civil liability if an objectively reasonable officer would think, as Lt. Lee says he did, that the Jeep was headed directly at him. In other words, if the Jeep's collision with the parked car reduced the threat of Mr. Manery's driving directly toward Lt. Lee, would an objectively reasonable officer still find the use of lethal force appropriate? Given the factual disputes in the record before us, we must acknowledge that a reasonable officer could find that the threat posed

by Mr. Manery to the officers' safety had lessened to a point where, given the totality of the circumstances, deadly force was no longer warranted. *See Smith*, 10 F.4th at 748.

Where a factual dispute precludes resolution of the first inquiry, as it does here, an officer may still be entitled to qualified immunity if the right was not clearly established. Accordingly, we assume but without deciding the constitutional violation and move on to the second step in the qualified immunity analysis. *Pearson v. Callahan*, 555 U.S. 223, 236–43 (2009).

For purposes of qualified immunity, "[a] right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Lovett v. Herbert*, 907 F.3d 986, 992 (7th Cir. 2018) (internal quotation omitted). There are two circumstances where a right will be regarded as clearly established. First, qualified immunity offers no refuge "if [the Seventh Circuit] or the Supreme Court ha[s] previously held that conduct analogous to the defendant officer's actions constitutes a violation of the right at issue." *Id.* A closely analogous case is not required in the second scenario, where a defendant officer's conduct is so "egregious" that no reasonable officer could believe he had acted lawfully. *Id.* (quoting *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000)).

Courts undertake this inquiry "in [the] light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Though there need not be a case directly on point, existing precedent must have placed the statutory or constitutional question beyond debate. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). Because courts focus "on whether the officer had fair notice that [his] conduct was unlawful,

reasonableness is judged against the backdrop of the law at the time of the conduct."
*Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

Mr. Manery relies on two Seventh Circuit cases for the proposition that he had a
clearly established right to be free from the use of excessive force.[6] *Scott v. Edinburg*, 346
F.3d 752, 757 (7th Cir. 2003); *Est. of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993).
Though this phrasing frames the right at stake too broadly, it is clear (and Defendants agree)
that deadly force is justified when a fleeing suspect drives straight at an officer. Thus, we
next ask whether every reasonable officer facing the same circumstances described here
would understand that his use of deadly force was unlawful. *See D.C. v. Wesby*, 583 U.S.
48, 63 (2018).

In *Scott*, an off-duty officer had stepped away from his Mustang after stopping at a
gas station. In his absence, a man attempted to steal the Mustang. After being alerted to the
car theft, the officer shouted commands at the suspect to stop. Rather than complying with
the officer's commands, the man revved up the engine of the Mustang and drove the car in
reverse toward the officer, prompting the officer to draw his revolver. When the Mustang
stopped moving backwards and began moving forward in the direction of a dozen bystand-
ers as well as the main roadway, the officer shot and killed the suspect. The parties in that
case disputed the precise moment when the officer discharged his first shot; to wit, whether

---

[6] Mr. Manery also cites *Rincon v. United States*, an unpublished district court case, as support for
his clearly established right. 2012 WL 1981725 (N.D. Ind. June 1, 2012). However instructive
*Rincon* might be, it certainly "cannot clearly establish a constitutional right because [it is] not
binding precedential authority." *Day v. Wooten*, 947 F.3d 453, 462 (7th Cir. 2020).

when the first shot occurred the suspect was still moving the car in reverse toward the officer. The timing of the first shot was "critical" to the determination of whether the suspect posed an immediate threat to the officer, for "the legality of the use of deadly force ended with the expiration of the threat." *Id.* at 757. However, the officer was found to be entitled to qualified immunity on the grounds that deadly force was reasonable to protect those dozen bystanders who stood in the immediate vicinity of the suspect's flight. *Id.* at 759.

In *Starks*, the Seventh Circuit ruled that a fleeing suspect's failure to brake after an officer suddenly stepped in front of his accelerating car did not pose a sufficiently grave threat to justify the use of deadly force. 5 F.3d at 234. There, the police used their own vehicles to corner a stolen taxicab in a parking lot. The driver placed the taxi in reverse and collided with a police vehicle, after which he attempted to pull forward, but a utility pole prevented his escape. The driver again attempted to maneuver the taxi and floor the accelerator, whereupon an officer jumped out from behind the utility pole and into the path of the moving taxi, prompting all three officers present at the scene to open fire. The holding in *Starks* turned on a single issue: whether the officer had "stepped in front of [the] rapidly moving cab, leaving [the driver] no time to brake." *Id.* at 233–34. Relying on the fact that the officer himself had increased the seriousness of the encounter by moving into the vehicle's trajectory without giving the driver time to stop, the court withheld the protections of immunity.

Both *Scott* and *Starks* involved a suspect driving directly at an officer, which action posed an immediate threat that might justify the use of deadly force. Lt. Lee maintains that

his use of deadly force was justified because he had fired his weapon as the Jeep moved ahead to strike him. The underlying factual disputes previously identified here foreclose that conclusion. Viewing the facts in the light most favorable to the non-moving party (Mr. Manery), the Jeep's movement toward Lt. Lee stopped when the Jeep struck the parked car. Lt. Lee's decision to shoot was made after Mr. Manery had nowhere to go, which effectively reduced the immediacy of the threat to the officers, making the use of deadly force unjustified.

Clearly, this "qualified immunity determination is intertwined with factual disputes concerning threat level." *Smith*, 833 F.3d at 749. A ruling on qualified immunity, therefore, must await a resolution of material factual disputes by the jury. *Id.* at 750. Only then may we properly reach a legal determination on the issue of qualified immunity. *Id.* (citing *Est. of Escobedo v. Martin*, 702 F.3d 388, 403–04 (7th Cir. 2012)). The motion for summary judgment based on qualified immunity is thus denied.

## III.  *MONELL* CLAIM

Though municipalities cannot be held vicariously liable for constitutional violations, they may find themselves liable "when execution of a government's policy or custom inflicts [an] injury," thus forming the basis of a Section 1983 lawsuit. *Monell v. Dep't. of Social Servs. of the City of New York*, 436 U.S. 658, 694 (1978).

To establish governmental liability, the plaintiff must show: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that, albeit not codified in either law or municipal policy, is so permanent and well settled so as to constitute a "custom or usage" with the force of law; or (3) an allegation that the

constitutional injury was caused by an individual with "final policymaking authority." *Est. of Crouch v. Madison Cnty.*, 682 F. Supp. 2d 862, 877 (S.D. Ind. 2010) (quoting *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007)).

A municipality will be liable for constitutional violations when its failure to train its officers adequately amounts to deliberate indifference to the rights of those individuals with whom officers come into contact. *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007). Of course, "there can be no liability under *Monell* for failure to train when there has been no violation of the plaintiff's constitutional rights." *Id.*

Here, it is undisputed that General Order 21 and the MCSO Rules and Regulations provided the standards for determining the appropriate circumstances for the use of force. Consistent with state standards, all fulltime and reserve sheriffs with the MCSO must complete 600 hours at an accredited training academy, as well as continued education courses every year. Nevertheless, Mr. Manery argues that the MCSO's policies and procedures and the accompanying training were insufficient, thus constituting deliberate indifference to the rights of the public. Because Mr. Manery has failed to adduce sufficient evidence that demonstrates the MCSO's deliberate indifference, his *Monell* claim necessarily fails.

Mr. Manery first takes issue with the fact that the MCSO has enacted only two use of force policies, but what ultimately matters for *Monell* purposes, as Defendants note, is that these policies were in place, were extensive, and covered all aspects of the use of force and that Lt. Lee was trained on them. Beyond vaguely suggesting that these two policies might in some way be inadequate, Mr. Manery articulates no challenge specific to their substance, nor does he dispute that Lt. Lee had been trained on these policies.

Mr. Manery also argues that Lt. Lee's inability during his deposition to recite with specificity the contours of his training or the MCSO's use of force policy demonstrates that the MCSO was deliberately indifferent in administering officer training. That Lt. Lee provided incomplete or otherwise unsatisfactory responses in his deposition, however, does not, nor could it, automatically make the MCSO liable for a failure to train. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 390–91 (1989); *see also Lapre v. City of Chicago*, 911 F.3d 424, 437 (7th Cir. 2018) (officers' failure to recall specific training programs does not amount to deliberate indifference). Mr. Manery points to no evidence from which we can reasonably infer deliberate indifference by the MCSO as a matter of policy or widespread practice. *Lapre*, 911 F.3d at 437.

Mr. Manery also contends that Defendants themselves failed to proffer "evidentiary materials in support of their defense," and, thus, they have not shown the absence of a genuine issue of material fact sufficient to merit summary judgment in their favor. Pl.'s Resp. 26, dkt. 58. More specifically, Mr. Manery claims that Defendants failed to produce evidentiary materials that fell within a request for production during discovery. For this omission, Mr. Manery argues, Defendants cannot prevail on a claim that the MCSO engages in a widespread practice of failing to train its deputies.

Mr. Manery's argument is misplaced in several respects. First, he improperly seeks to transform his burden of demonstrating a viable *Monell* claim into Defendants' burden of disproving his *Monell* claim. There is no legal authority that supports such a shift. Second, and perhaps more importantly, a summary judgment responsive brief is not the appropriate setting in which to raise a discovery dispute for the first time. Mr. Manery's contention

arises from Plaintiff's First Request for Production of Documents, wherein he sought "[a]ll documents that evidence, support, contradict, refer to, and/or relate to any claim that the actions each Defendant took were not in violations of William Manery's constitutional rights and/or were not negligent." Pl.'s Resp. 27, dkt. 58. Defendants produced General Order 21 while also objecting to the request as being overly broad. MCSO RFP Resp. 15, dkt. 64-1.

General Order 21 directs the MCSO to conduct an annual analysis of all uses of lethal and less lethal weapons to identify trends or patterns that could instruct future improvements in the MCSO trainings and policies. Roberts Aff. Ex. 2, 22, dkt. 48-7. However, Mr. Manery apparently never specifically requested copies of those annual reports, nor did he follow up in response to Defendants' discovery objection, as provided by our Local Rule 37-1, whereby the parties must meet and confer in good faith to resolve discovery disputes before seeking court intervention. *See generally* S.D. Ind. Local Rule 37-1. Even if the parties had met and conferred but without reaching a resolution, a responsive brief to a motion for summary judgment is not the point at which to raise the issue with the court; indeed, Plaintiff's delay represents a failure to exercise due diligence. *See Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1057 n.5 (7th Cir. 2000) ("[W]e believe that a party needing additional discovery is under an obligation to bring the issue before the court in an expeditious manner.").

Having failed to adduce evidence from which a reasonable juror could find that the MCSO was deliberately indifferent in its training of Lt. Lee or any of its other officers with

regard to the use of deadly force, Mr. Manery's *Monell* claim against the MCSO fails, and Defendants are entitled to summary judgment on this claim.

## IV. STATE LAW CLAIMS

Mr. Manery has also brought various state law claims against Defendants Lt. Lee in his official capacity as well as against the MCSO. Mr. Manery has already conceded that the Consolidated City is not responsible for the actions of the MCSO or its employees and, therefore, is not a properly suable entity. Mr. Manery's remaining claims allege that the MCSO was negligent in training and supervising Lt. Lee; and that Lt. Lee's and the MCSO's actions were negligent, criminal, malicious, and/or willful and wanton in their conduct.

### A. Indiana Tort Claim Act Immunity

Mr. Manery has sued Lt. Lee in both his personal and official capacities. Under the Indiana Tort Claims Act ("ITCA"), Ind. Code § 34-13-3-3, there is no liability on the part of an individual employee who was acting within the scope of his employment. *Ball v. City of Indianapolis*, 760 F.3d 636, 645 (7th Cir. 2014). Here, it is undisputed that Lt. Lee, a reserve deputy with the MCSO, was acting within the scope of his duties during his confrontation with Mr. Manery. Accordingly, Mr. Manery's state law claims against Lt. Lee in his personal capacity necessarily fail.

The ITCA also grants immunity against civil liability based on an officer's purported negligence in the execution of law enforcement duties. *Miller v. City of Anderson*, 777 N.E.2d 1100, 1104 (Ind. Ct. App. 2002); *F.D. v. Indiana Dep't of Child Servs.*, 1 N.E.3d 131, 136 (Ind. 2013) ("The negligence of a defendant is not relevant if it is immune.

27

Immunity assumes negligence but denies liability.") (internal quotation marks and citation omitted). Here, it is undisputed that Lt. Lee was engaged in law enforcement duties at the time of his encounter with Mr. Manery: therefore, Lt. Lee is entitled to the ITCA immunity on Mr. Manery's negligence claims against him.

### B.   Use-of-force Statute

Indiana law provides complete immunity for police officer civil liability based on the "justified use of force," as it is defined in Indiana Code § 35-41-3-2. *See generally* I.C. § 34-30-31-1. Section 35-41-3-2 states that the use of deadly force is justified "if the person reasonably believes that force is necessary to prevent serious bodily injury to the person or a third person or the commission of a forcible felony." *Id.* § 35-41-3-2.[7] Indiana's excessive force standard parallels the Fourth Amendment standard, permitting officers to utilize reasonable force in effectuating an arrest. *Est. of Williams v. Indiana State Police*, 26 F.Supp.3d 824, 863 (S.D. Ind. 2014). In this regard, Mr. Manery's excessive force claim under state law rises or falls with his Section 1983 claim. *Id.* at 864. Thus, the previously detailed factual disputes that foreclose our resolution of the issues relating to Lt. Lee's use of deadly force under Section 1983 also preclude resolution of Mr. Manery's state law claims at this stage of the proceedings.

---

[7] Mr. Manery argues that section 35-41-3-3(c) is "more applicable" here because it codifies the circumstances when a law enforcement officer is justified in using deadly force to effect an arrest. The Indiana Code's civil immunity statute, however, specifically directs us to section 35-41-3-2, so we shall follow that instruction. In any event, Mr. Manery has not explained how reliance on either statute would affect the outcome of our analysis. Thus, we shall adhere to the statutory language as written.

Defendants maintain that they are entitled to judgment because Mr. Manery pled guilty to a forcible felony, and Indiana law permits the use of deadly force to deter a person engaged in committing a forcible felony. Relying on *Cromer v. Sefton*, 471 N.E.2d 700, 705 (Ind. Ct. App. 1984), Mr. Manery argues that his guilty plea is inadmissible to establish any of the elements in his civil case. *See also Matter of Knight*, 55 F.3d 231, 236 (7th Cir. 1995) (discussing imposition of civil liability based on party's guilty plea). In *Cromer*, the Indiana Court of Appeals, in apparent agreement with Mr. Manery, explained that "[e]ven a guilty plea is not conclusive but is only evidence as an admission." 471 N.E.2d at 705.

It is undisputed that Mr. Manery entered a guilty plea to one count of resisting law enforcement, a Level 6 Felony under Indiana law. The plea agreement, in relevant part, expressly stipulates that it "constitutes an admission of the truth of all the facts alleged in the charge or counts" to which Mr. Manery has pled guilty. Plea Agreement 2, dkt. 57-11. Nowhere in the plea agreement, however, is a recitation of the underlying facts giving rise to the charge. According to Mr. Manery, he pled guilty because "[s]upposedly I hit two cop cars and tried to run from them." Manery Dep. 35:23–24, dkt. 48-1. Defendants' contention that Mr. Manery pled to "driving . . . at Lt. Lee" is not supported in the factual record before us. Defs.' Br. 20, dkt. 47. The factual dispute on this point remains unresolved.

Without reference to the factual basis for Mr. Manery's plea agreement, that document does not, in and of itself, operate as an admission against his interest. Well-established precedent holds that "[a]n arrestee's commission of a crime does not justify the use of force without limit." *Perri v. Daggy*, 776 F.Supp. 1345, 1347 (N.D. Ind. 1991). Defendants have

29

thus failed to establish their entitlement to judgment as a matter of law on these state law claims. Summary judgment is accordingly denied.

## CONCLUSION

For the reasons explicated above, Defendants' Motion for Summary Judgment, dkt. 46, is **DENIED IN PART** and **GRANTED IN PART**. The motion is <u>denied</u> as to Plaintiff's Section 1983 and corresponding state law claims against Lt. Lee and the MCSO. The motion is <u>granted</u> as to Plaintiff's *Monell* claim against the MCSO and state law negligence claim against Lt. Lee. The case shall proceed accordingly.

The Clerk is **DIRECTED** to terminate Defendant Consolidated City of Indianapolis and Marion County from the docket.

IT IS SO ORDERED.


Date:

_____2/9/2024_____

_SARAH EVANS BARKER_ (signature)

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Frederick Holton Hovde
Waldron Tate Bowen Spandau
holt@wtb-lawyers.com

Amy Stewart Johnson
Frost Brown Todd LLP
asjohnson@fbtlaw.com

John P. Lowrey
City of Indianapolis
john.lowrey@indy.gov

Barry F. McGinley
Frost Brown Todd LLP
bmcginley@fbtlaw.com

Joshua S. Moudy
KAMMEN & MOUDY
josh@kammenlaw.com

Anthony W. Overholt
Frost Brown Todd LLP
aoverholt@fbtlaw.com

Katherine Anne Piscione
Waldron Tate Bowen Land LLC
katie@wtb-lawyers.com

Brandon Eric Tate
Waldron Tate Bowen LLC
brandon@wtb-lawyers.com